Brian **BROOKS**, Plaintiff,

v.

**METRICA, INC., et al.**, Defendants.

**Civil Action No. 97–1261–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

April 6, 1998.

Sharon Fast Gustafson, Arlington, VA, for Plaintiff.

Edward J. Tolchin, Fettmann, Tolchin & Majors, P.C., Fairfax, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this ERISA action, plaintiff seeks both statutory and consequential damages based on defendants' alleged failure to invest his contribution in the company 401(k) plan, to provide him information regarding the status of his contribution, and to send him a copy of certain plan documents. Because defendants' conduct violated various sections of ERISA, plaintiff is entitled to damages as provided by statute for each day on which defendants were in violation of the Act.

### I

Plaintiff Brian Brooks is a former employee of defendant Metrica, Inc.,[1] where he began working on or about March 11, 1996.[2] On May 17, 1996, Brooks signed a contribution chart and enrollment form, thus enrolling himself in Metrica's 401(k) retirement plan ("the Plan") and instructing his employer to make contributions from his salary to the Plan and to invest these contributions in certain mutual funds. Metrica was the administrator of the Plan, and in this regard Brooks alleged in his complaint that "Metrica became a fiduciary with respect to Plaintiff's 401(k) funds by exercising 'discretionary responsibility' in the administration of the plan, pursuant to 29 U.S.C. § 1002(21)(A)(iii)." Metrica denied this allegation in its answer, though it later admitted, in its summary judgment papers, that it was indeed a fiduciary of the Plan. Although Metrica was the administrator and a fiduciary, the record-keeping for the Plan was done by a company called BISYS. BISYS provided one copy of the Summary Plan Description (the "SPD") to Metrica, and left it to Metrica to distribute copies of the SPD to its participants.

In June 1996, Brooks called Lorraine Hellums, the head of Metrica's employee-benefits office, to ask how he could transfer funds from his 401(k) plan at his prior employer, Comstat, to the Plan at Metrica. Hellums instructed Brooks to send her a check in the amount of the proceeds from his Comstat plan, and that she would take care of the matter for him. These were the only instructions Hellums gave Brooks with respect to the transfer of funds. Pursuant to these instructions, in June 1996, Brooks mailed Hellums a check for $7,045.25, which represented the proceeds from his Comstat plan. Hellums sent the check on to Capital Guardian Trust Co. ("CGTC"), the trustee for the fund in which Brooks's contribution would be invested, and CGTC received the check on June 24, 1996. The Plan provided that "[c]ontributions are credited to your accounts as soon as the contributions are received by the Trustee." Yet this did not occur; instead, Brooks's money was placed in the trustee's interest-bearing cash account. It later appeared that this occurred because Hellums did not know to submit to BISYS a Rollover Contribution Form at the same time she submitted Brooks's $7,045 check to CGTC. Until BISYS received the Rollover Contribution Form, the $7,045 could not be invested by CGTC in the designated funds. BISYS did not notify anyone at Metrica that it had not received the requisite form. So, Brooks's money was not invested in the Plan, but instead languished in the trustee's interest-bearing cash account, where it earned $283.16 in interest.[3] None of this was communicated to Brooks at the time. As far as

---

1. Brooks has named as defendants Metrica, Inc. and Metrica Division II Employee Savings and Retirement Plan. These parties are collectively referred to as "Metrica."

2. The recitation of facts herein, unless otherwise indicated, is based on the parties' joint stipulation of facts filed in conjunction with the instant summary judgment motions, and on other undisputed record facts.

3. The earned interest has yet to be paid to Brooks, although Metrica asserts that the payment is being processed.

he knew, his money had been invested in the Plan, as he had requested.

Thereafter, in September 1996, Brooks left Metrica's employ. Then, in October 1996, Metrica sent Brooks an account statement that did not list the $7,045 as having been deposited in his 401(k) account; Brooks contends that he never saw this statement.[4] On December 30, 1996, Brooks, now in a new job, executed a Direct Rollover Request Form (this is a different form from the Rollover Contribution Form) instructing Metrica to roll over his account balance into a Lincoln Life retirement fund. Hellums received this form on December 31, and BISYS received it in early January 1997. Metrica was obligated to distribute Brooks's accrued benefits in a lump sum in accordance with his instructions as soon as administratively feasible after receiving such a request. On January 8, 1997, Metrica rolled over $369.08 of Brooks's benefits to his Lincoln Life plan. This amount consisted only of Brooks's contributions to his Metrica 401(k) plan while he was a Metrica employee, plus earnings on those contributions. None of Brooks's $7,045 was rolled over; instead, this money, unbeknownst to Brooks, remained in the trustee's account.

In January 1997, Brooks received a second quarterly statement of his Metrica 401(k) account. This statement, like the earlier one in October, made no mention of the $7,045. Faced with this and with notice that only $369.08 was rolled over from his Metrica 401(k) to his new Lincoln Life account, Brooks understandably became concerned and called Hellums three times on January 17, 1997, to inquire about the status of his contribution.[5] Hellums returned his calls that same day. During their conversation, Hellums told Brooks that there was no trace of his ever having made a $7,045 rollover contribution to his 401(k) account at Metrica. Brooks responded that he knew that he had

sent Hellums a $7,045 check, and thus he wanted to know (i) what had happened to the check he had sent, (ii) why the money had not been deposited in his account, and (iii) how to get his money back. Hellums agreed to call Brooks back with this information. By early April, Hellums still had not provided him with any of the information he requested.

Hellums admits she did not know that BISYS and CGTC required the Rollover Contribution Form, and she admits that she made a mistake in June 1996 in not advising Brooks of the need for this form. Once Hellums did learn of the need for this form,[6] she tried to call Brooks to relay this information, but she was not able to reach him. Although Brooks has an answering machine, he claims that he did not receive any message from Hellums; for her part, Hellums does not recall whether she left any message or not.

During this period, Brooks was experiencing great aggravation and frustration from not being able to recover his $7,045 from Metrica; moreover, he feared that this money, which constituted his life's savings, was lost forever. Accordingly, in March 1997, he retained an attorney. On March 6, 1997, the attorney sent Hellums a letter describing the events to date and Brooks's frustration. After receiving this letter, Hellums, on March 21, 1997, completed a Rollover Contribution Form relating to Brooks's $7,045, allocating the sum to two different mutual funds (approximately fifty percent in each). Hellums sent this form to BISYS, which on March 25, 1997, invested the money as directed by Hellums. On that same day, the shares were sold; however, BISYS did not refund the proceeds to Brooks through Lincoln Life until mid-April, and even then imposed a $326.12 sales charge for the one-day investment. Thus, in mid-April, BISYS sent

---

4. According to Metrica, the statement had a paragraph at the bottom that read, "We make every effort to ensure the highest degree of accuracy for each account. Please review this statement carefully and notify us within 30 days of receipt if you believe there is an error."

5. Both the January and October account statements listed an 800 number for Plan members to

call, but Brooks did not call that number. Brooks states he never saw this number on the January statement.

6. It is not clear from the record when Hellums became aware of her mistake or of the need for the Rollover Contribution Form.

Brooks a check for approximately $6,719 (the initial contribution less the sales charge) and accompanying documentation concerning the distribution of these proceeds.[7]

As a result of these events, Brooks's counsel sent a letter to Metrica's president, Mr. Bruce Dunson, on April 7, 1997. To that letter, she appended a copy of the March 6 letter she had written to Hellums. On July 23, 1997, Brooks's counsel sent Dunson, by certified mail, a letter and draft copy of the complaint in this matter. This draft complaint was received on July 28.[8] In response, Metrica's counsel attempted to reach Brooks's counsel by phone; unable to do so, he wrote her a letter on July 31; on August 7, the attorneys spoke by phone about the July 23 letter and draft complaint. This conversation was the first time Brooks or his counsel used the phrase "Summary Plan Description" to describe the information Brooks requested. Brooks filed his complaint on August 11, 1997; on August 12, before receiving the complaint, Metrica's counsel forwarded the Plan's adoption agreement to Brooks's counsel by facsimile; and on August 14 Metrica received a copy of the complaint. The next day, August 15, 1997, Metrica provided Brooks's counsel with a copy of the SPD. Since that time Metrica has also supplied Brooks with employment forms, his retirement plan statements, and interrogatory and document responses.

## II

Two general issues present themselves on the parties' cross-motions for summary judgment: first, whether Metrica failed to provide Brooks with certain information as required by ERISA, and second, whether Metrica's handling of Brooks's contribution constituted a breach of fiduciary duty. Of course, summary judgment is proper only when the record conclusively shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. This standard is satisfied when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "mere scintilla" of evidence, however, is not enough. For the nonmoving party to avoid summary judgment, the evidence, when viewed in the light most favorable to that party, must be sufficient for a reasonable jury to find in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the instant circumstances, there is no genuine issue of material fact; moreover, based on the facts as stipulated by the parties, no reasonable jury could find for Metrica here, and thus summary judgment must be entered in Brooks's favor.

A. *Failure to Provide Information as Required by ERISA*

ERISA imposes on plans and administrators numerous obligations to provide information to their participants. For purposes of the instant motions, there are three pertinent statutory obligations. Section 1133 requires the plan to provide a participant with written notice of the reasons it denied the

---

7. Although irrelevant to the issues in dispute, Metrica points out that had Brooks's $7,045 been invested as he directed in June 1996, and then sold in January 1997 when he requested his money back, it appears he would have lost more money (because of the drop in the share price of the mutual funds) than the $326.12 deducted as a sales charge.

8. Metrica does not stipulate that it received the April 7 letter. Brooks's counsel addressed the letter to Mr. Bruce Benson; however, the president's name is Bruce Dunson. Moreover, the letter was sent to Metrica headquarters in San Antonio, though Dunson works primarily from the company's New Jersey office. Notably, however, the April 7 letter was never returned to Brooks's counsel for improper addressing. Furthermore, Metrica admits that Dunson received the July 23 letter, for which Brooks's counsel used the same name and address as appeared on the April 7 letter. Thus, the record facts certainly support the inference that Mr. Dunson received the April 7 letter. Whether or not he did, however, is immaterial to resolution of the instant motions, as the April 7 letter to Dunson simply reiterated the requests Brooks's counsel had made in her earlier March 6 letter to Hellums.

participant's claim for benefits.[9] Section 1024(b)(1) requires a plan administrator to supply the SPD to a plan participant automatically within ninety days after the employee becomes a participant. And finally, § 1024(b)(4) requires the plan "upon written request of any participant [to] furnish a copy of the latest updated summary plan description, plan description, [and various other plan documents]."

A breach of any of these obligations is not without consequences. An administrator "who fails or refuses to comply with a request for any information which such administrator is required ... to furnish to a participant by mailing the material requested ... within thirty days after such request may in the court's discretion be personally liable to such participant ... in the amount of up to $100 a day from the date of such failure or refusal." 29 U.S.C. § 1132(c)(1).

Here, Brooks twice requested information: once orally, by telephone, on January 17, 1997, and once in writing, through counsel's letter, on March 6, 1997. Metrica never provided Brooks a copy of the SPD within ninety days of his becoming a participant, nor did it provide him with most of the other information he requested until after the complaint in this matter was filed on August 11, 1997.

### 1. The Oral Request

In his January 17 phone call, Brooks requested two types of information. First, he inquired as to the reason his claim for benefits had been denied. Second, he asked for information concerning what process to follow to recover his money. Each request is treated separately here. First, there is no doubt that a denial of a claim occurred. On December 30, 1996, Brooks asked that his funds be rolled over, and on January 17, 1997, he called Hellums to inquire about the status of his funds. When Hellums stated on the phone that there was no record of a $7,045 deposit, Brooks informed her that he wanted his full contribution returned; however, Brooks did not receive any information from Hellums, BISYS, or CGTC regarding the whereabouts of his $7,045 until mid-April. Here, when Brooks could not even file a written claim because Hellums did not tell him the proper procedures he needed to follow, the failure to respond to his oral demand for the return of his contribution constituted a denial of a claim for benefits. The SPD itself states that "[i]f you receive no response of any kind within 60 days after filing a claim, you should consider the claim denied." Though Brooks did not "file" a claim, he certainly lodged a specific complaint and request with Hellums, which is the most that could be expected of him given the lack of information and assistance from Metrica.[10] In sum, Brooks plainly inquired why his claim for benefits had been denied. Although Metrica was required by §§ 1132 and 1133 to furnish this information within thirty days of the request, it did not do so. Thus, Metrica is liable for the statutory penalties set forth in § 1132(c)(1). See Wilczynski v. Lumbermens, 93 F.3d 397, 406 (7th Cir.1996) (noting that violations of § 1133 and of 29 C.F.R. § 2560.503–1(f) are grounds for liability under § 1132(c)).

Metrica asserts that Brooks cannot base his prayer for damages on an oral request because § 1024(b)(4) specifically states that the administrator must furnish the enumerated documents "upon written request" of the participant. Notwithstanding this language in § 1024(b)(4), Metrica's challenge

---

9. "In accordance with regulations of the Secretary, every employee benefit plan shall provide adequate notice in writing to any participant ... whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial ...." 29 U.S.C. § 1133(1). The regulations, in turn, provide that the plan *administrator* shall provide the written reasons for denial. *See* 29 C.F.R. § 2560.503–1(f). Thus, Metrica's contention that any penalty for a violation of § 1133 should be assessed against the Plan, and not the plan administrator, is meritless.

10. The case at bar is thus distinguishable from *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 180–81 (7th Cir.1994), in which the participant had the requisite claim forms but did not complete them properly. In that case, the Seventh Circuit held that the plan had no obligations under § 1133 because it never denied the claim, as the claim was never properly submitted for consideration.

fails, for the written-request requirement of § 1024(b)(4) applies only to requests for information made under that section, not to requests for information required by other ERISA sections (e.g., § 1133). Precisely this point was made by the Ninth Circuit in *Crotty v. Cook*, 121 F.3d 541 (9th Cir.1997). In that case it was held that an oral request is sufficient to trigger civil penalties for an administrator's failure to provide information when the participant relies on a section other than § 1024(b)(4). *See* 121 F.3d at 547–48. In *Crotty*, the participant orally requested the plan to send him its SPD; the plan did not provide this document within ninety days of Crotty's becoming a participant, even though this obligation is imposed on all plans by § 1024(b)(1). Because subsection (b)(1)—unlike (b)(4)—does not require that a request be made in writing before the SPD is provided, the Ninth Circuit held that the failure to provide the SPD, in violation of subsection (b)(1), triggered the $100–a–day penalty. *See id.; see also Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1139 (D.C.Cir.1989) ("[S]ection 1024(b)(1), which imposes no written request requirement, creates a duty distinct from that imposed by section 1024(b)(4)."). Thus a plan's failure to comply with a participant's oral request for information ERISA requires the plan to provide is sufficient to trigger statutory damages, provided that the Act does not explicitly state that the request for the relevant documents or information must be made in writing. *See Crotty*, 121 F.3d at 548 (noting that § 1132(c) provides "that the penalty is applicable if the administrator refuses to comply with a request for any information [that the] administrator is required by this subchapter to furnish to a participant").[11] Accordingly, the failure to provide a written explanation for the denial of benefits, as was required by § 1133 after Brooks orally requested that information, exposes Metrica to the penalty provision of § 1132(c).

■ The second set of information Brooks orally requested was a description of the process for pursuing a claim for benefits. Hellums did not provide him with this information in response to his phone call. Indeed, Brooks did not receive this information until after Metrica was served with the complaint on August 14, 1997. In this regard, Brooks emphasizes that he is claiming that Metrica failed to send him this *information* in a timely fashion, not that it failed to send him the SPD (which happened to contain the requested information). Thus Brooks does not contend that in the January phone call he asked Metrica for a "document," but only that he asked for certain information, and that the information was not provided. It may be that Brooks finds this subtle distinction important because § 1024(b)(4) requires that requests for certain documents be in writing, and his January 17 request was oral. The distinction is untenable. To hold otherwise would allow plan participants to make an end-run around ERISA's written-request provision simply by asking for all the information contained in every document listed in § 1024(b)(4), but refraining from requesting the document itself. Of course, to comply with such a request, the administrator would likely have to furnish the participant with the responsive, but technically unrequested, documents. Common sense and the evident intent of the statute preclude countenancing such a result. Brooks cannot escape the in-writing requirement of subsection (b)(4) by arguing that he asked not for the document but for the information contained in it.

■ In any event, this flaw in Brooks's argument ultimately does not alter the conclusion that Metrica violated ERISA in not providing him with the requested information. Even assuming that the oral request was for the document itself, the information that Brooks sought regarding the process for pursuing a claim for benefits must, by stat-

---

11. The cases Metrica cites to rebut this proposition are inapposite and thus unpersuasive. Those cases hold that certain vague, written requests and certain oral requests did not satisfy the particular subsections of ERISA at issue when those subsections required that the participant make a specific request in writing. *See, e.g., Haberern v. Kaupp Vascular Surgeons*, 24 F.3d

1491, 1505 (3rd Cir.1994); *Damon v. Unisys Corp.*, 841 F.Supp. 1094, 1098 (D.Colo.1994); *Tracey v. Heublein, Inc.*, 772 F.Supp. 726, 728 (D.Conn.1991). None of the cited cases addresses the situation presented here, namely an oral request for information pursuant to an ERISA subsection that does not require that the request for information be made in writing.

ute, be contained in the SPD. *See* 29 U.S.C. § 1022(b). And, as noted above, the Plan had an obligation to send the SPD to Brooks within ninety days of his becoming a participant, *regardless* of any oral or written request. *See* 29 U.S.C. § 1024(b)(1). Section 1024(b)(4) requires a written request only for an *updated* copy of the SPD, not for the first copy that a participant receives automatically upon becoming a member of the plan. Thus, Brooks was not required by the statute to make any request for the SPD, or for the information contained in it, let alone a request in writing. *See Crotty*, 121 F.3d at 547 ("The administrator of the plan was obligated to furnish Crotty with the summary plan description at specified times, without the need for any request by Crotty.") Because Metrica did not provide Brooks with the information he sought or with the SPD within ninety days of his becoming a participant, it violated § 1132(c). *See id.* at 548 ("[I]f the participant requests something he was entitled to receive automatically, without any request, then the civil enforcement penalty provision applies without regard to whether the request was in writing.") Notwithstanding all of this, Brooks does not seek any damages for this particular violation of ERISA, namely the failure to provide the SPD, and thus none are awarded.

## 2. *The Written Request*

Brooks also made a written request for information through a letter sent by his counsel to Hellums on March 6, 1997. This letter concluded with the following paragraph:

> Please send me a copy of your plan documents describing the procedures Mr. Brooks must follow in pursuing his complaint. Please also inform me of the name of the plan administrator and all other persons who are fiduciaries of the plan. Please call me immediately to discuss this.

■ A written request for documents under § 1024(b)(4) implicates the penalty provision of § 1132(c)(1) only if the request gives the administrator "clear notice" of exactly what information is sought. *See Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 655 (4th Cir.1996), *cert. denied* — U.S. —, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997). Thus, when a participant "fails to make a specific request for the information at issue, he has no litigable claim under [§ 1132(c)]." *Williams v. Caterpillar, Inc.*, 944 F.2d 658, 667 (9th Cir.1991).[12]

■ The first sentence of the paragraph quoted from counsel's letter specifies the particular documents counsel was seeking, and thus satisfies the *Faircloth/Williams* test. *See Anderson v. Flexel, Inc.*, 47 F.3d 243, 250 (7th Cir.1995) ("While the [attorney's] letter does not request the beneficiary designation forms or policy handbook by name, an administrator cannot use such technical considerations as an excuse for its failure to respond."); *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1071 (6th Cir.1994) ("[The document] so obviously contains the information that Plaintiffs expressly described when they requested 'worksheets,' that Defendants either knew or should have known that they were obliged to furnish it in response to Plaintiffs' request. Imposing a burden upon Plaintiffs to ask for the [document] by name rather than by description would be contrary to the spirit of § 1024(b)(4)"). *Compare Haberern*, 24 F.3d at 1506 (holding written request insufficient when participant merely asked for "a meeting" or simply "complain[ed] that certain materials had not been supplied"). Moreover, the plan description and the SPD are the only plan documents required by ERISA to set out the procedures for disputing the denial of a claim. *See* 29 U.S.C. § 1022(b). Thus, when Brooks's counsel asked for information regarding these procedures, her request necessarily gave "clear notice" of which

---

12. *Faircloth* and *Williams* are both cases that discuss written requests for information, although it is reasonable to conclude that the requirement of demand specificity applies to oral requests as well. Neither party has raised any argument in this regard. In any event, Brooks's phone conversation with Hellums on January 17, 1997, certainly passes muster for specificity. During that conversation, Brooks asked what had happened to the check he sent, why the money had not been deposited in his account, and how he could get his money back. These pointed questions surely are sufficient to give "clear notice" of the information he sought.

documents she was seeking. From this it follows that Metrica's failure to send Brooks's counsel these documents within thirty days of when she requested them subjects it to the penalty provision of § 1132(c)(1).[13]

■ Finally, Brooks's counsel, in the second sentence from her letter quoted above, requested identification of the Plan's named fiduciaries. ERISA requires that a plan document identify the plan's named fiduciary or fiduciaries. *See* 29 U.S.C. § 1102(a). Again, as with the others, Metrica did not respond to this request when it was made. Nor when counsel again asked in discovery for identification of the fiduciaries did Metrica comply. As noted above, Brooks alleged that "Metrica became a fiduciary with respect to Plaintiff's 401(k) funds by exercising 'discretionary responsibility' in the administration of the plan." In response, on November 5, 1997, defendants denied that Metrica was the fiduciary of the Plan, and did not ultimately admit that Metrica was the named fiduciary until February 6, 1998, when Metrica filed its opposition to Brooks's motion for summary judgment. At oral argument, counsel for Metrica stated that the allegation was initially denied because Metrica's fiduciary status was in no way tied to its discretionary responsibility. That is, according to defendants, Metrica was a fiduciary regardless of what discretion it exercised, and thus defendants denied the allegation because it suggested otherwise. This argument is unpersuasive. From defendants' denial, all Brooks could surmise was that defendants denied that Metrica was the fiduciary; there was no indication that the denial was directed only to one part of the allegation. Thus, the failure to identify the fiduciary constituted a refusal to provide information required by §§ 1102(a) and 1132(c). When Metrica refused—for some 93 days, from November 5, 1997, to February 6, 1998—to identify the named fiduciary, it subjected itself to additional liability under § 1132(c)(1).[14]

### 3. *Damages*

■ Once it is determined that a defendant has violated the strictures of ERISA, the amount of the statutory penalty to be imposed, if any, is left to the discretion of the court. *See* 29 U.S.C. § 1132(c)(1); *Faircloth*, 91 F.3d at 659. "[P]rejudice is a factor that a district court may consider in deciding whether to impose a penalty. The district court may also consider whether the administrator acted in bad faith." *Faircloth*, 91 F.3d at 659. However, "prejudice to the party requesting the documents is not a prerequisite to the imposition of penalties" because the purpose of § 1132(c)(1) "is not to compensate participants for injuries, but to punish noncompliance with ERISA." *Id.; see also Davis v. Featherstone*, 97 F.3d 734, 738 (4th Cir.1996) ("Although prejudice is a pertinent factor for the district court to consider, it is not a prerequisite to imposing a penalty").[15] In short, then, while a showing of bad faith of the defendant or prejudice to the plaintiff certainly supports imposing the penalty, such a showing is not necessary; to recover statutory damages a plaintiff need only show that the defendant did not comply with the statute.

■ Based on the facts at bar and the conclusions above that Metrica violated ERISA in several instances, imposition of the penalty is clearly warranted. *See Glocker v. W.R. Grace & Co.*, 1995 WL 600468, at *4 (4th Cir. Oct.12, 1995) ("The purpose of the civil penalty provision is to encourage otherwise reluctant employers to provide beneficiaries with documents without undue delay, and to punish those who remain intransigent in the face of requests for information").

---

13. Metrica somehow believes that it should not be held liable for its conduct because "[t]hese types of snafues [sic] occur on a daily basis as our society becomes more and more complicated and confusing." Opp. at 23. This excuse is as irrelevant as it is unconvincing.

14. Brooks does not seek damages for the failure to identify the fiduciaries for any period prior to November 5, 1997.

15. Given these clear Fourth Circuit pronouncements, the cases Metrica cites from other jurisdictions that require a showing of either bad faith or exceptional circumstances before the penalty is imposed are unpersuasive.

Moreover, even if Brooks were required to prove prejudice, the parties have stipulated that he suffered "frustration, trouble, and expense," and such prejudicial harms "are relevant factors for a district court to consider in deciding whether to impose a penalty." *Davis*, 97 F.3d at 738. Also included in the prejudice calculus is "the trouble and expense of engaging an attorney to obtain the [employer's] plan." *Id.* Here, Brooks did not get a copy of the SPD until after Metrica received a copy of the complaint in this action; Brooks clearly needed to engage an attorney if he was to obtain any Plan documents.

■ Given that some penalty is warranted, the next step is to determine the amount of a daily penalty to be assessed. The following factors are relevant in fixing that amount: (i) the prejudice Brooks suffered; (ii) Metrica's and Hellums' failure to provide Brooks or his attorney with information that should be readily available to those who administer employee-benefits plans and to their participants; (iii) Metrica's unreasonable litigation conduct in refusing to settle this matter; (iv) the cavalier attitude displayed by Metrica in response to these requests; and (v) the absence in the record of any suggestion that either Metrica or Ms. Hellums acted in bad faith.[16] Both Metrica's and Hellums' conduct fell far short of what must be expected of a plan administrator and its agents in responding to participants' questions and complaints. In the circumstances, then, an award of $100 for each day on which Metrica was in violation of the statute would be warranted. *See Freitag v. Pan American World Airways*, 702 F.Supp. 128, 132 (E.D.Va.1988) (assessing $100–a–day penalty even in the absence of a showing of bad faith); *cf. Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1494 (11th Cir.1993) (noting that "the penalty range of up to $100 per day is unrelated to any injury suffered by the plan participant, suggesting that section 1132(c) is intended to punish noncompliance with the employer or administrator's disclosure obligations"), *cited with approval in Glocker*, 1995 WL 600468, at \*3. Nonetheless, the absence of bad faith here justifies a modest adjustment in the penalty to be assessed from $100 to $80 for each day on which Metrica was in violation. *See Glocker*, 1995 WL 600468, at \*4 ("While the absence of bad faith is a factor in determining whether penalties are warranted, it does not of itself exonerate the failure to provide a timely statement of benefits").

■ It remains to be determined, then, how many days Metrica was in violation of ERISA. Metrica did not send Brooks the Plan documents until August 15, 1997, the day after it received a copy of the complaint in this matter. This was 209 days after Brooks made his oral request, and thus 179 days after the time in which Metrica was required by statute to respond. *See* 29 U.S.C. § 1132(c)(1) (requiring administrator to respond to requests for information within thirty days). This was also 157 days after Metrica received Brooks's counsel's letter,[17] and thus 127 days after the time in which it was required to respond to that request. These violations, if treated separately, would provide the basis for two awards of $14,320 and $10,160, respectively. Yet, because the failure to respond to the written request was essentially a continuation of the failure to respond to the oral request, the Court will impose a total penalty of $14,320 to cover the duration of Metrica's refusal to provide documents and information in response to these two requests. Finally, Brooks is entitled to recover $7,440 for the 93 days Metrica denied that it was a fiduciary of the Plan.

16. *Cf. Glocker*, 1995 WL 600468, at \*5 (holding that when assessing a penalty under § 1132(c), "[t]he district court should take into account, among other factors, [the administrator's] lack of bad faith, the prejudice to [the participant], the length of the delay, the time and expense incurred by [the participant's] attorneys in their efforts to obtain [the] Plan, and the amount needed to suitably punish the administrator").

17. The date the letter was received is not indicated in the record. What is known is (i) that the letter was sent on March 6 and (ii) that a subsequent letter sent on July 23 was not received by Metrica until July 28. Thus, assuming that the March 6 letter also took five days to get to Metrica, the written request is deemed, for damages purposes, to have been received on March 11.

## B. *Breach of Fiduciary Duty*

 In addition to Metrica's refusal to provide the requested information and documents, Brooks points to Metrica's handling of his $7,045 contribution as further evidence of its failure to abide by certain standards set forth in ERISA. ERISA imposes on the fiduciary of every plan the obligation to "discharge his duties ... solely in the interest of the participants and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use ...." 29 U.S.C. § 1104(a). In other words, the fiduciary is held to a reasonableness standard.

 Brooks alleges that Metrica breached its fiduciary duty in (i) failing to return the $7,045 rollover contribution upon his request; (ii) placing this money in an interest-bearing account and not telling him where his money went until after the commencement of this lawsuit and, to date, not paying him the interest from that account; and (iii) withholding the $326.12 from his contribution as a sales charge incurred in connection with a one-day investment made *after* he requested that the money be returned to him. It is beyond cavil that these transactions were not "solely in the interest of the participant[ ]." 29 U.S.C. § 1104(a). As a result of these various breaches of fiduciary duty, Brooks claims he suffered the following damages: (i) $283.16 in interest earned from the cash account that did not accrue to him, but instead accrued to the trustee; and (ii) the $326.12 incurred as a sales charge.

At the outset, it must be noted that when a fiduciary does not meet its obligations under the statute, the fiduciary is liable to a private plaintiff for damages caused by the breach of its duty even if there is no specific provision in ERISA providing for relief in the exact circumstances presented. *See Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 1078, 134 L.Ed.2d 130 (1996) (holding that the "catchall" provisions of § 1132 "act as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy"); *id.* at 1076 (noting that the "words of [§ 1132] are broad enough to cover individual relief for breach of a fiduciary obligation"); *cf. Coyne & Delany Co. v. Blue Cross & Blue Shield of Va., Inc.*, 102 F.3d 712, 716 (4th Cir.1996) (noting that § 1132 does not provide a "catchall" remedy for those violations for which ERISA elsewhere does provide an adequate remedy). Metrica's repeated claims that there is no available remedy for a breach of fiduciary duty thus ring hollow.

With respect to the specific damages sought by Brooks, Metrica argues that he is entitled to no recovery. As to the interest charge, Metrica contends that Brooks is not entitled to any relief because "Mr. Brooks did not lose interest, as his funds earned interest while in the cash account." Opp. at 16. This disingenuous argument glosses over the obvious point that though the funds earned interest, this interest was remitted to CGTC, the trustee, not to Brooks. Thus, Metrica must pay Brooks the interest that accrued while his contribution was in the trustee's account.

 As to the sales charge, Metrica asserts that whether the $7,045 had been invested immediately in June 1996 (when Brooks first asked for the rollover) or not until March 1997 (when it was invested for one day), the same sales charge would have applied. Metrica claims that this is so because before it could transfer the contribution to Brooks's new Lincoln Life account, its accounting procedures required it to invest the $7,045 in its own 401(k) plan—thus the one-day investment. Notably, however, Metrica's counsel admitted at oral argument that there is no ERISA provision and no regulation promulgated pursuant to that Act that requires such an accounting procedure. In essence, Metrica and CGTC developed these procedures at their own peril; whatever accounting or tax or efficiency-related justifications they might have had for investing Brooks's $7,045 before rolling it over do not save Metrica from the obligations the statute rightly imposes on fiduciaries. In sum, Metrica breached its fiduciary duty in causing Brooks to incur the sales charge once he had expressly stated that he did not want his money to be invested with the Metrica plan. Consequently, the full amount of the sales charge must be awarded to him.

## C. *Attorney's Fees*

 ERISA permits district courts to award reasonable attorney's fees to a prevailing party. *See* 29 U.S.C. § 1132(g)(1). There is, however, "no presumption in favor of awarding attorney's fees." *Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1209 (4th Cir.) (internal quotation marks omitted), *cert. denied* —— U.S. ——, 118 S.Ct. 629, 139 L.Ed.2d 609 (1997). The Fourth Circuit has established a five-factor test for making a fees award under ERISA. *See Quesinberry v. Life Ins. Co. of N. Amer.*, 987 F.2d 1017, 1029 (4th Cir.1993). The district court should consider (i) the degree of the losing party's culpability or bad faith; (ii) that party's ability to pay the fees award; (iii) the deterrence impact of such an award; (iv) whether the instant action addresses a significant question of law under ERISA or whether it benefits all plan members; and (v) the relative merits of the parties' positions. *See id.*

 As to the first factor, Metrica was certainly culpable. It held Brooks's $7,045, his life's savings, for several months without telling him what it had done with the money. When he asked for information from Ms. Hellums, she did not respond; when he hired an attorney, the attorney was given only some of the information requested; and it was not until after receipt of the complaint that Metrica sent Brooks a copy of the SPD. As to the second factor, there is nothing in the record indicating Metrica's ability to pay, though it seems reasonable to assume that, like most 401(k) plans, the Plan has a significant amount of assets and could easily satisfy any judgment ordering the payment of fees in this case. As to factor number three, imposing the award will send a message to other officials like Ms. Hellums that claiming "I made a mistake" is insufficient to absolve oneself and the plan of liability under ERISA, and it will encourage others in her position to be more responsive to participants' questions and complaints. The fourth factor applies to the instant facts only in that there is no controlling authority in this circuit that applies or adopts the rationale of *Crotty*. Furthermore, Brooks's suit was not for the benefit of Plan members in general.[18] Finally, as to the fifth factor, Metrica's arguments lacked merit both at the summary judgment stage and at the 12(b)(6) stage. Indeed, Metrica's rhetoric in its recent briefs amounted to little more than "Hellums just made an innocent mistake" and "Brooks wasn't hurt nearly as badly as he claims." Moreover, some of the legal arguments Metrica advanced were contrary to Fourth Circuit and Supreme Court case law.[19]

In sum, application of the *Quesinberry* factors points persuasively to the conclusion that an attorney's fees award is amply justified in the circumstances.

### III

For the foregoing reasons, Brooks's motion for summary judgment must be granted, and Metrica's cross-motion for summary judgment must be denied. In addition, Brooks is entitled to the following relief:

(i) $14,320 in statutory damages for failure to provide plan information and documents requested by Brooks on January 17, 1997, and again on March 11, 1997;

(ii) $7,440 in statutory damages for failure to identify the named fiduciary;

(iii) $609.28 for damages caused by breach of fiduciary duty; and

(iv) attorney's fees and other costs in-

---

**18.** Though it could be said that the instant action will force Metrica to be more careful with its participants' money, and thus that the suit has engendered a result that redounds to the benefit of all Plan participants, such logic would effectively mean that *every* ERISA action brought by a private plaintiff would benefit the plan members at large, and thus this factor would become superfluous.

**19.** For example, Metrica insisted in its Motion to Dismiss that there is no remedy available under ERISA for breach of fiduciary duty. This position, of course, directly contradicts the specific holding of *Varity Corp.*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130, in which the Supreme Court stated that such a remedy in fact does exist; Metrica's counsel continued to advance this position even after Brooks's counsel cited *Varity* in her opposition brief.

curred in connection with this action.[20]

An appropriate Order will issue.

**20.** A separate Order will set a briefing schedule for a determination of the fees and costs incurred in connection with this action.